# United States District Court
# District of Massachusetts

JAMES AND SHONNA GAUL,
     Plaintiffs,

       v.                              CIVIL ACTION NO. 12-10129-NMG

AURORA LOAN SERVICES LLC,
     Defendant.

## REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO DISMISS (#5)

COLLINGS, U.S.M.J.

### I. Introduction

This action arises from plaintiffs James and Shonna Gaul's ("the Gauls") attempts to modify their home mortgage loan with defendant Aurora Loan Services LLC ("Aurora").[1]  On January 23, 2012, the Gauls filed a six-count complaint in the United States District Court for the District of Massachusetts against defendants Aurora and Aurora Bank FSB seeking permanent injunctive

---

[1]
       The complaint names both Aurora Loan Services LLC and Aurora Bank FSB as defendants in the body of the complaint. (*See* #1 ¶¶ 2, 3)  However, Aurora Bank FSB is not listed in either the caption of the complaint or on the docket as a defendant.  Further, the plaintiffs have not filed proofs of service on either defendant. The motion to dismiss has been filed only on behalf of Aurora Loan Services LLC. The complaint must be amended to deal with this problem.

relief and civil damages. (#1)  The complaint alleges breach of contract of the Servicer Participation Agreement ("SPA") (Count I); breach of contract of the Workout Agreement (Count II); breach of the implied duty of good faith and fair dealing (Count III); promissory estoppel (Count IV); negligence (Count V); and violation of Mass. Gen. L. c. 93A (Count VI).

On June 26, 2012, in lieu of answering the complaint, Aurora filed a motion to dismiss Court I for lack of standing and Counts II-VI pursuant to Fed. R. Civ. P. 12(b)(6), failure to state a claim upon which relief can be granted (#5) and a supporting memorandum of law (#6).  On July 18, 2012, the Gauls filed an Opposition to the Motion to Dismiss with attached exhibits. (#7)[2]

## II. Factual Background[3]

In June 2006, the Gauls purchased their townhouse condominium for $350,000 and have resided at the property since that time. (#1 ¶ 24)   In December 2006, the Gauls refinanced their current 30-year fixed rate mortgage of $300,800 along with a 15-year second mortgage. (#1 ¶ 25) Aurora is the assignee and was the servicer of the Gauls' mortgage until July 21, 2011, when

---

[2]

There appears to be a typo in the title of plaintiffs' memorandum in opposition to the motion to dismiss.  The motion should be titled "Memorandum in Opposition to *Defendant's* Motion to Dismiss."

[3]

All facts are taken from the plaintiffs' complaint.

its service was transferred to Aurora's parent company, Aurora Bank. (#1 ¶ 26)

*The Home Affordable Modification Program*

On October 3, 2008, Congress passed the Emergency Economic Stabilization Act of 2008 and amended it with the American Recovery and Reinvestment Act of 2009 on February 17, 2009 (collectively "the Act"). (#1 ¶ 6)  On February 18, 2009, pursuant to the Act the Treasury Secretary and the Director of the Federal Housing Finance Agency established the Making Home Affordable program. (#1 ¶¶ 7, 9)  This program created and implemented a uniform loan modification protocol known as the Home Affordable Modification Program ("HAMP"). (#1 ¶ 10)  Under HAMP, the federal government incentivizes participating servicers to enter into agreements with borrowers that will adjust their mortgage obligations to a more affordable monthly payment. (#1 ¶ 12)

Aurora entered into a Servicer Participation Agreement ("SPA") with the federal government as a participating servicer under HAMP. (#1 ¶ 13)  The SPA, pursuant to the HAMP guidelines, requires servicers to: (1) review all eligible applications for a HAMP modification; (2) suspend foreclosure proceedings pending such review; (3) communicate decisions to borrowers within defined time parameters; and (4) offer foreclosure alternatives if a

borrower is found ineligible for a modification. (#1  ¶¶ 14-16)

A HAMP modification consists of two stages. (#1 ¶ 17)  First, the servicer is required to gather information and, if the borrower qualifies, offer the borrower a trial period plan ("TPP"). (#1 ¶ 17)  Before a servicer offers a borrower a TPP, the servicer must determine that the loan meets certain criteria and whether the borrower would be eligible for a permanent modification if the TPP is successful. (#1 ¶ 19)  If offered, a TPP consists of a three-month period in which the homeowner makes mortgage payments in an amount determined using HAMP rules. (#1 ¶ 18)  If the homeowner complies with the terms of the TPP, the second stage of the HAMP modification is triggered, in which the homeowner is offered a permanent modification. (#1 ¶ 20)

In addition to HAMP, Aurora offers an in-house modification program and a temporary plan called a Foreclosure Alternative Agreement ("FAA"). (#1 ¶ 21)  The Gauls allege that under the FAA Aurora has induced homeowners who have difficulty making loan payments to make reduced or no payments on their loans, thus resulting in default of their loans, with the promise that the homeowners will thereafter receive a permanent loan modification. (#1 ¶ 22) Additionally, they allege that Aurora has failed timely to process the

modification applications, failed to communicate accurately and clearly with homeowners about the status of their applications, failed to consider applications in good faith or grant modification to eligible homeowners, and generally dragged out the process to the point where homeowners have suffered loss of credit, other opportunities to mitigate their circumstances and, in many cases, their homes. (#1 ¶ 23)

*The Gauls' Effort to Participate in a HAMP Modification Program*

In 2009, Mr. Gaul first sought modification of the mortgage due to a reduction in the family income after the birth of twin children resulting in Mrs. Gaul no longer working outside of the home. (#1 ¶ 27)  At this time, the Gauls' mortgage payments and monthly condominium fees amounted to 45% of their monthly income. (#1 ¶ 28)  Despite reducing their monthly expenses, liquidating retirement accounts, and suspending student loan payments, the Gauls continued to struggle to make their mortgage payments. (#1 ¶¶ 29-30) The request to Aurora for a modification under HAMP was rejected on the stated ground that their loan payment to income ratio was too low. (#1 ¶ 31)

In the spring of 2010, the Gauls spoke with Aurora's loss mitigation department and were convinced to apply for HAMP again, and also for Aurora's own internal modification program. (#1 ¶ 32)  The Gauls were rejected for

both programs on the stated ground that their loan payment to income ratio was too low. (#1 ¶ 33)  Although the Gauls were financially struggling, they continued to make their mortgage payments in full each month. (#1 ¶ 34)

*The Workout Agreement and the Gauls' Chapter 93A Demand*

In September 2010, Aurora contacted the Gauls and offered them participation in a new program designed to help people who were in financial distress but still current on their mortgage payments. (#1 ¶ 35)  Aurora explained that under the new program: (1) the Gauls would enter into an agreement with Aurora where they would pay a reduced monthly mortgage amount, which would constitute to a trial payment for the modification; (2) the reduced amount would place them into a technical default on their mortgage, which would qualify them for a permanent modification under the government program; (3) after three to four months of successful payments under the agreement their mortgage would be reviewed by the underwriting team; and (4) if their income remained stable, a permanent modification would be approved. (#1 ¶ 36)  On October 25, 2010, the Gauls entered a Foreclosure Alternative Agreement ("Workout Agreement") with Aurora to the end of obtaining a permanent modification as represented by Aurora. (#1 ¶

37)

Under the Workout Agreement, Aurora agreed to forbear from exercising its rights and remedies under the mortgage, provided that the Gauls did not default under the terms of the agreement. (#1 ¶ 38)  The Workout Agreement provided that the Gauls would make a reduced payment of $1,542.24 for six months, and that they would provide Aurora with accurate and complete financial information and documentation. (#1 ¶ 39)  Per the agreement, the Gauls timely paid the stipulated amount and provided Aurora with all requested documents. (#1¶ 41)

In December 2010, for the fourth time, the Gauls received a request for more information and were asked to re-submit the entire modification application with all financial data. (#1 ¶ 42)  The Gauls complied with all of the requests. (#1 ¶ 42)  In January 2011, the Gauls began receiving monthly letters and periodic phone calls from Aurora stating that their mortgage was in default and to contact Aurora immediately. (#1 ¶ 43)  Each time the Gauls received these communications they called Aurora to confirm that they were in a special forbearance program under the Workout Agreement and not in default. (#1 ¶ 44)  The Gauls were told not to worry, that everything was proceeding as it should, and that they were receiving the notifications as a

routine part of the overall process. (#1 ¶ 45)  During this time, the Gauls were not informed of any meaningful updates on their application for permanent modification and their credit scores were each reduced by at least 100 points. (#1 ¶ 46)

At the end of March 2011, the Gauls received notification that their request for a loan modification had been rejected, and the past due balance on their mortgage was due in full or foreclosure proceedings would began. (#1 ¶ 47)  When Mrs. Gaul inquired about the rejection she received two separate and different answers. (#1 ¶ 48)  One department told her it was due to incomplete paperwork but could not identify what was missing, and another said that the loan was not past due by 60 days but this contradicted other information that Aurora had been sending to the Gaul's since January 2011. (#1 ¶ 49)  The Gauls received additional letters regarding the rejection, including: (1) a notice stating that they were rejected due to incomplete paperwork; (2) a notice that they had until August to pay or foreclosure proceedings would begin; and (3) a letter inviting them to apply again for a home loan modification from Aurora. (#1 ¶ 50)

The Gauls allege that Aurora's actions have caused them to suffer ongoing and increasing damage to their credit scores even though they made every

monthly payment in a timely fashion. (#1 ¶ 51)  The decrease in the Gauls'
credit scores has caused a reduction in their available credit from other lenders,
and has harmed Mr. Gaul's business and reputation as a financial advisor. (#1
¶ 52)  Additionally, the Gauls allege they have experienced emotional distress
because of the lack of clarity of Aurora's position, Aurora's assurances that they
would be approved for a permanent modification if they complied with the
Workout Agreement, and the threat of foreclosure proceedings. (#1 ¶ 53)  On
June 10, 2011, the Gauls sent Aurora a letter of demand pursuant to Mass.
Gen. L. c. 93A, § 9. (#1 ¶ 54)  In response, Aurora acknowledged that there
was no documentation missing from the Gauls' file and that this explanation
for the denial was incorrect. (#1 ¶ 54)

### III. Standard for Dismissal Under Fed. R. Civ. P. 12(b)(6)

A Rule 12(b)(6) motion to dismiss challenges a party's complaint for
failing to state a claim. In deciding such a motion, a court must "'accept as true
all well-pleaded facts set forth in the complaint and draw all reasonable
inferences therefrom in the pleader's favor.'" *Haley v. City of Boston*, 657 F.3d
39, 46 (1st Cir. 2011) (quoting *Artuso v. Vertex Pharm, Inc.*, 637 F.3d 1, 5 (1st
Cir. 2011)). When considering a motion to dismiss, a court "may augment
these facts and inferences with data points gleaned from documents

incorporated by reference into the complaint, matters of public record, and facts susceptible to judicial notice." *Haley*, 657 F.3d at 46 (citing *In re Colonial Mortg. Bankers Corp.*, 324 F.3d 12, 15 (1st Cir. 2003)).

In order to survive a motion to dismiss under Rule 12(b)(6), the plaintiff must provide "enough facts to state a claim to relief that is plausible on its face." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The "obligation to provide the grounds of [the plaintiff's] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (quotation marks and alteration omitted). The "[f]actual allegations must be enough to raise a right to relief above the speculative level," and to cross the "line from conceivable to plausible." *Id.* at 555, 570.

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).   However, the court is "'not bound to accept as true a legal conclusion couched as a factual allegation.'" *Id.* at 678(quoting *Twombly*, 550 U.S. at 555).  Simply, the court should assume that well-pleaded facts are genuine and then determine whether such facts state a

plausible claim for relief. *Id*. at 679.

## IV. Discussion

### A. Breach of Contract of the Servicer Participation Agreement (Count I)

Aurora contends that the Gauls lack standing to bring a claim for breach

of the SPA between Aurora and the United States Department of Treasury.  In

order to bring such a claim, plaintiffs must show that they are the third-party

beneficiaries of the agreement. *Alpino v. JPMorgan Chase Bank, Nat. Ass'n*, No.

1:10-12040-PBS, 2011 WL 1564114, at *3 (D. Mass. Apr. 21, 2011) (citing

*Speleos v. BAC Home Loans Servicing, L.P.*, 755 F. Supp.2d 304, 307-08 (D.

Mass. 2010)).  The majority of federal courts that have considered whether

homeowners are third-party beneficiaries of the SPA hold that they are not.

*Alpino*, 2011 WL 1564114, at *3 (citing *Speleos*, 755 F. Supp. 2d at 310).

Specifically, the court in *Speleos* held that "despite a colorable argument to the

contrary, the terms of the [SPA]" establish that homeowners are not third-party

beneficiaries of the agreement. 755 F. Supp.2d at 310.

It is noted that the author of the opinion in *Speleos* is the same District

Judge to whom this case is assigned.  There being no reason to suppose the

District Judge has changed his mind on the issue, I shall recommend that

Count I be dismissed for lack of standing.

B. *Breach of Contract of the Workout Agreement (Count II)*

"A breach of contract is a failure to perform the terms of the agreement without legal excuse." *Guckenberger v. Boston Univ.,* 957 F. Supp. 306, 316 (D. Mass. 1997) (citing *Compagnie de Reassurance d'Ile de France v. New England Reinsurance Corp.,* 825 F. Supp. 370, 380 (D. Mass. 1993), *modified,* 57 F.3d 56 (1st Cir.1995), *and cert. denied,* 516 U.S. 1009 (1995)).  In order to assert a claim for breach of contract, a plaintiff "must allege 'that there was a valid contract, that the defendant breached its duties under its contractual agreement, and that the breach caused the plaintiff damage.'" *Bosque v. Wells Fargo Bank, N.A.,* 762 F. Supp.2d 342, 351 (D. Mass. 2011)(quoting *Guckenberger,* 957 F. Supp. at 316).  Aurora contends that the pleadings of the complaint are legally and factually insufficient to establish a breach of its performance under the Workout Agreement.

The defendant's argument is not well taken.  The Gauls allege, *inter alia*, that in October 2010 they entered into the Workout Agreement with Aurora pursuant to which if they made the requisite reduced mortgage payments, provided accurate and complete financial information and documentation to Aurora, and maintained stable income over a period of six months, a permanent modification of their mortgage would be approved.  The Gauls

12

further allege that they timely paid the amount stipulated under the Workout Agreement and provided Aurora with all of the documentation required under the Workout Agreement.  In March of 2011 Aurora notified the Gauls that their request for modification had been rejected due to incomplete paperwork.   In response to a demand letter in June 2011, Aurora acknowledged that there was no documentation missing from the Gauls' file and that this explanation for the loan modification rejection was incorrect.  As a result of Aurora's actions with respect to the Workout Agreement, the Gauls allege that they have suffered damage with respect to their credit scores, harm to Mr. Gaul's reputation and business, and emotional distress.

With these facts the Gauls have adequately alleged the elements of a breach of contract claim.   Aurora's motion to dismiss Count II should be denied.

### C. Breach of the Implied Duty of Good Faith and Fair Dealing (Count III)

It is well-established that "[t]he covenant of good faith and fair dealing is implied in every contract." *Uno Restaurants, Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 385, 805 N.E.2d 957, 964 (Mass. 2004) (citing *Kerrigan v. Boston,* 361 Mass. 24, 33, 278 N.E.2d 387 (1972) (further citation omitted)); *Lass v. Bank of America, N.A.*, 695 F.3d 129, 137 (1st Cir. 2012); *T.W.*

*Nickerson, Inc. v. Fleet Nat. Bank*, 456 Mass. 562, 569-70, 924 N.E.2d 696,

703 (Mass. 2010).  The covenant requires contracting parties "to deal honestly

and in good faith in both the performance and enforcement of the terms of

their contract . . . ." *Hawthorne's, Inc. v. Warrenton Realty, Inc.*, 414 Mass.

200, 211, 606 N.E.2d 908, 914 (Mass. 1993) (citing Restatement of Contracts

(Second) § 205 comment a (1979)).  Applying Massachusetts law, the First

Circuit has explained that

> '[T]he purpose of the implied covenant is to ensure
> that neither party interferes with the ability of the
> other to enjoy the fruits of the contract and that when
> performing the obligations of the contract, the parties
> remain faithful to the intended and agreed
> expectations of the contract.' *FAMM Steel, Inc. v.
> Sovereign Bank*, 571 F.3d 93, 100 (1st Cir. 2009)
> (quoting *Chokel v. Genzyme Corp.*, 449 Mass. 272,
> 867 N.E.2d 325, 329 (2007)) (internal quotation
> marks omitted); *see also Nile v. Nile*, 432 Mass. 390,
> 734 N.E.2d 1153, 1160 (2000). To succeed with a
> claim based on the implied covenant, the plaintiff must
> 'present[ ] evidence of bad faith or an absence of good
> faith.' *T.W. Nickerson, Inc. v. Fleet Nat'l Bank*, 456
> Mass. 562, 924 N.E.2d 696, 706 (2010) (stating also
> that 'no evidence of an improper motive ... was
> presented at trial, and no facts presented at trial
> support a finding of an absence of good faith'); *see
> also Uno Rests.*, 805 N.E.2d at 964 n. 5; *Nile*, 734
> N.E.2d at 1160 (stating that a lack of good faith 'may
> be inferred by evidence that the [conduct] was
> unreasonable under all the circumstances'). Evidence
> that the defendant acted 'to gain an advantage for

itself' can support a claim for breach of the covenant.
*See T.W. Nickerson*, 924 N.E.2d at 707.

*Lass,* 695 F.3d at 138.

The Gauls allege that Aurora breached the implied duty of good faith and fair dealing by, among other things, (1) failing to comply with the requirements of HAMP; (2) coercing them into signing the Workout Agreement; (3) issuing misleading and conflicting information about the status of their requests for loan modifications; and (4) unilaterally cancelling the agreement.  Aurora argues that these allegations are insufficient to establish that it breached the covenant of good faith and fair dealing under the contract.

The defendant is correct with respect to two points.  First, even if Aurora failed to comply with HAMP guidelines, the Gauls cannot bring a breach of the implied duty of good faith and fair dealing claim because they "are neither parties to [the SPA] nor intended beneficiaries of it . . . ." *Markle v. HSBC Mortg. Corp. (USA)*, 844 F. Supp.2d 172, 184 (D. Mass. 2011); *Speleos*, 755 F. Supp.2d at 310.  Second, while the alleged coercive practices used to induce the Gauls to enter into the Workout Agreement may fit the nature of a fraudulent inducement claim, it cannot be the basis of a breach of the implied duty of good faith and fair dealing claim because it occurred prior to the

formation of the contract. *Markle,* 844 F. Supp.2d at 183-84 (quoting

*Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.,* 412 F.3d

215, 230 (1st Cir. 2005) (noting that "the covenant only governs conduct of

parties after they have entered into a contract")).

With that having been said, the Gauls have stated a claim with respect to

the rejection of their loan modification request.  As noted above, the plaintiffs

allege that they complied with all of the terms of the Workout Agreement,

were advised that their loan modification was denied consequent to inadequate

documentation, and yet Aurora later purportedly admitted that, in fact, there

was no paperwork missing from the Gauls' file.  These allegations are sufficient

to state a claim for breach of the covenant of good faith and fair dealing, and

the motion to dismiss Count III should be denied.

### D. Promissory Estoppel (Count IV)

The doctrine of "[p]romissory estoppel is usually asserted as an

alternative theory of recovery for a contract that is not supported by

consideration." *Bosque*, 762 F. Supp.2d at 353.  "To prove a claim of

promissory estoppel under Massachusetts law, 'a plaintiff must allege that (1)

a promisor makes a promise which he should reasonably expect to induce

action or forbearance of a definite and substantial character on the part of the

promisee, (2) the promise does induce such action or forbearance, and (3) injustice can be avoided only by enforcement of the promise.'" *Neuhoff v. Marvin Lumber & Cedar Co.*, 370 F.3d 197, 203 (1st Cir. 2004) (quoting *Carroll v. Xerox Corp.*, 294 F.3d 231, 242 (1st Cir. 2004) (further citation omitted and footnote)).   Aurora argues that the claim of promissory estoppel must be dismissed because no facts have been alleged to establish the elements of the cause of action.

The Gauls allege that Aurora contacted them in September 2010 and offered them participation in a new program designed to help people who were in financial distress but current on their mortgage payments.  Aurora explained that under the program: (1) the Gauls' mortgage payments would be reduced; (2) the payment of the reduced mortgage amount would put the Gauls in default; and (3) if the Gauls made all the default payments, complied with the terms of the Workout Agreement, and their income remained stable they would be approved for a permanent loan modification.  Relying on these statements, the plaintiffs entered into the Workout Agreement. The Gauls allege that they complied with all the terms of the agreement, yet were denied permanent loan modification.  Additionally, the plaintiffs contend that the default payments have damaged their credit scores, Mr. Gaul's business and reputation as a

17

financial planner, as well as having caused them emotional distress.

Based on the allegations in the complaint, the Gauls have sufficiently pled facts that give rise to a claim under the alternative theory of promissory estoppel should their breach of contract claim fail for lack of consideration. Courts have specifically recognized that actions by a servicer or lender that induce a borrower to go into default as a condition of being considered for a loan modification can be actionably under the doctrine of promissory estoppel. *See Dixon v. Wells Fargo Bank, N.A.*, 798 F. Supp.2d 336, 348 (D. Mass. 2011)(holding that the plaintiffs stated a claim for promissory estoppel where servicer induced them to default on their payments in order to qualify for a modification); *see also Mack v. Wells Fargo Bank, N.A.*, No. WOCV201002228, 2011 WL 4837261, at *7 (Mass. Super. Ct. Aug. 31, 2011) (holding that the plaintiffs stated a claim for promissory estoppel where servicer induced them to made reduced payments in order to obtain a modification).  In any event, with the plaintiffs' breach of contract claim having been found sufficient, the promissory estoppel claim need not be addressed further  at this juncture. *See Bosque*, 762 F. Supp.2d at 353 (*citing Durmic v. J.P. Morgan Chase Bank, N.A.*, 2010 WL 4825632, at *5 (D. Mass. Nov. 24, 2010)).  Aurora's motion to dismiss Count IV should be denied.

### E. Negligence (Count V)

In their negligence claim, the Gauls assert that, in "undertaking to consider Plaintiffs for a loan modification and commencement of the workout agreement, Defendant assumed a duty of care to the Plaintiffs." (#1 ¶ 89) According to the plaintiffs, "[t]hat duty of care required the Defendant to use reasonable care and diligence in processing Plaintiffs' requests for modification." (#1 ¶ 90)  Aurora is alleged to have breached its duty, and that breach is said to have caused harm to the Gauls' credit scores and to Mr. Gaul's reputation and career and caused emotional distress.[4]

To prevail on a claim of negligence, a "plaintiff must allege that the defendant (1) owed a legal duty to the plaintiff, (2) breached that duty and (3) was the proximate or legal cause of (4) actual damage or injury." *Speleos*, 755 F. Supp.2d at 310 (citing *Jorgensen v. Mass. Port Auth.*, 905 F.2d 515, 522 (1st Cir. 1990)).  Generally, lenders do not owe a duty to borrowers. *See FAMM Steel, Inc. v. Sovereign Bank*, 571 F.3d 93, 102 (1st Cir. 2009) (citing *Superior*

---

[4]

   The Gauls argue that they suffered emotional distress, however, absent any "'physical harm manifested by objective symptomatology'" this allegation is not sufficient to establish the personal injury requirement of a negligence claim. *See Brown v. Quest Diagnostics, LLC*, No. 08-11517-RGS, 2008 WL 5236033, at *3 (D. Mass. Dec. 16, 2008) (quoting *Payton v. Abbott Labs,* 386 Mass. 540, 557, 437 N.E.2d 171, 181 (1982)).

*Glass Co. v. First Bristol County Nat'l Bank,* 380 Mass. 829, 832, 406 N.E.2d 672, 674 (1980)(explaining that the relationship between a lender and a borrower, without more, does not give rise to a duty)); *Corcoran v. Saxon Mortgage Services, Inc.*, No. 09-11468-NMG, 2010 WL 2106179, at *4 (D. Mass. May 24, 2010)("a lender owes no general duty of care to a borrower"). Furthermore, even where a duty does exist, the economic loss doctrine bars negligence claims where the breach results in purely economic loss without any personal injury or property damage. *Cummings v. HPG Int'l, Inc.*, 244 F.3d 16, 24 (1st Cir. 2001) (quoting *FMR Corp. v. Boston Edison Co.,* 415 Mass. 393, 395, 613 N.E.2d 902, 903 (Mass. 1993)); *Corcoran*, 2010 WL 2106179, at *4.

Aurora argues that absent a showing of non-economic loss, the Gauls' negligence claim is barred by the economic loss doctrine.  In response, the plaintiffs contend that the economic loss doctrine does not apply to negligence claims involving misrepresentation.

It is true that the SJC has recently confirmed that the economic loss doctrine "does not apply to 'pecuniary loss incurred as a result of an actionable misrepresentation.' *See Nota Constr. Corp. v. Keyes Assocs., Inc.*, 45 Mass. App. Ct. 15, 20–21 n. 1, 694 N.E.2d 401 (1998)." *Passatempo v. McMenimen,* 461 Mass. 279, 302, 960 N.E.2d 275, 294 (Mass. 2012).  The problem here is that

the Gauls' claim is one for common law negligence, not negligent misrepresentation. Count V of the complaint is labelled "Negligence," and the allegations plainly track the elements of a negligence cause of action. Since Count V is a claim for negligence, and such a claim is barred by the economic loss doctrine, it should be dismissed.

Negligent misrepresentation is a separate and distinct cause of action from common law negligence. "In order to recover for negligent misrepresentation a plaintiff must prove that the defendant (1) in the course of his business, (2) supplies false information for the guidance of others (3) in their business transactions, (4) causing and resulting in pecuniary loss to those others (5) by their justifiable reliance upon the information, and (6) with failure to exercise reasonable care or competence in obtaining or communicating the information." *Nota Const. Corp. v. Keyes Associates, Inc.*, 45 Mass. App. Ct. 15, 19-20, 694 N.E.2d 401, 405 (Mass. App. Ct. 1998). Given the allegations of the complaint, it appears that the Gauls could assert an actionable claim for negligent misrepresentation, and such a claim would not be subject to dismissal under the economic loss doctrine. *Passatempo,* 461 Mass. at 302, 960 N.E.2d at 294; *Nota Const. Corp.*, 45 Mass. App. Ct. at 19-20, 694 N.E.2d at 405. Therefore, I shall recommend that the plaintiffs be

granted leave to amend their complaint to add a claim for negligent misrepresentation.

### F. Violation of Mass. Gen. L. c. 93A (Count VI)

To succeed on a claim under Mass. Gen. L. c. 93A, a plaintiff must show that the defendant engaged in unfair "methods of competition and unfair or deceptive acts or practices" in business transactions. Mass. Gen. L. c. 93A, § 2(a). As limned by the Massachusetts Supreme Judicial Court,

> Chapter 93A creates new substantive rights and, in particular cases, makes conduct unlawful which was not unlawful under the common law or any prior statute. The statute does not define unfairness, recognizing that there is no limit to human inventiveness in this field. What is significant is the particular circumstances and context in which the term is applied. It is well established that a practice may be deemed unfair if it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness.

*Com. v. Fremont Investment & Loan*, 452 Mass. 733, 742-743, 897 N.E.2d 548, 556 (Mass. 2008) (internal citations and punctuation omitted).

Even in the absence of other claims, a plaintiff may sue under chapter 93A if there are sufficient facts to support the claim. *Alpino*, 2011 WL 1564114, at *5 (noting that even though the plaintiffs did not have a federal cause of action under HAMP, the defendant's violations of HAMP may form the basis of state law causes of action); *Ording v. BAC Home Loans Servicing, LP,* No.

10–10670–MBB, 2011 WL 99016, at *7 (D. Mass. Jan.10, 2011) ("the lack of a private cause of action under HAMP ... does not automatically dispose of the chapter 93A claim").

The Gauls contend that Aurora failed to comply with the HAMP requirements by rejecting the loan modification on the ground that their mortgage payment to income ratio was too low. Additionally, the Gauls allege numerous misrepresentations made in connection with the Workout Agreement including: (1) being told that if they adhered to the agreement terms, which they state they did, they would be approved; (2) receiving two separate and different reasons for the rejection of their modification request; (3) having negative information reported to the credit reporting agencies which is a possible breach of the agreement; and (4) failing to provide meaningful and accurate updates on the progress of the loan modification applications. These allegations are sufficient to state a claim under chapter 93A for unfair or deceptive practices. *See Bosque*, 762 F. Supp. 2d at 353-54 (providing that the allegations "that defendant made deceptive, false or misleading representations to plaintiffs regarding their eligibility for a permanent loan modification and their rights under HAMP . . . are plainly sufficient to state a claim under ch. 93A for unfair or deceptive practices") (internal citation omitted). Aurora's

23

motion to dismiss Count VI should be denied.

## V. Conclusion

For the reasons stated, I RECOMMEND that Defendant's Motion to Dismiss (#5) be ALLOWED as to Counts I and V and DENIED as to Counts II, III, IV and VI.  I FURTHER RECOMMEND that the plaintiffs be GRANTED LEAVE to file an amended complaint properly naming the parties to the action and adding a claim for negligent misrepresentation.

## VI.  Review by the District Judge

The parties are hereby advised that any party who objects to these recommendations must file a specific written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the recommendations, or report to which objection is made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b), Fed. R. Civ. P., shall preclude further appellate review.  *See Keating v. Secretary of Health and Human Services*, 848 F.2d 271 (1st Cir. 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678

F.2d 376, 378-379 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.,*

616 F.2d 603 (1st Cir. 1980); *see also Thomas v. Arn*, 474 U.S. 140 (1985).

/s/ *Robert B. Collings*

ROBERT B. COLLINGS
United States Magistrate Judge

February 7, 2013.